# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| NATIONAL UTILITY REVIEW, LLC, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) 1:10CV93 ) |
| HUNTER MANAGEMENT L.L.C., ERIC ROTHNER, and DAVID M. ARONIN, | ) ) ) ) |
| Defendants. | ) ) |

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This matter comes before the Court on the motion to dismiss Plaintiff's amended complaint for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), and for failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6), filed by Defendants Hunter Management L.L.C. ("Hunter"), Eric Rothner, and David Aronin. (Docket No. 30.) This motion has been fully briefed, and the Court heard oral argument on May 9, 2011.

## FACTS, CLAIMS, AND PROCEDURAL HISTORY

In late May and early June 2006, Plaintiff National Utility Review, LLC ("NUR") and Care Centers, Inc. ("CCI") entered into three contracts to enable NUR to audit the utility invoices of certain CCI elderly care facilities to determine whether cost savings could be identified. (Docket No. 29, Amended Complaint ("Am. Compl."), Exs. 4, 5, 6 (copies of

contracts).) Each of these three contracts was signed by David Aronin as the CFO of CCI. (*Id*.) Each was also signed by Chris Leng, President of NUR. (Docket No. 31, Defs.' Br. In Supp. of Renewed Mot. to Dismiss, Exs. 1A, 1B, 1C.) Defendant Eric Rothner was the President/CEO of CCI during the relevant time period. (Am. Compl. at 2.)

The first agreement is entitled "Refunds Only Agreement" and covers 10 facilities. (*Id*., Ex. 4.) Under this contract, NUR receives a 50% share of all the utility rebates/refunds CCI receives as a result of NUR's efforts. (*Id*.) Pursuant to this contract NUR did not identify any rebates/refunds due to CCI, and NUR charged no fees to CCI. (Am. Compl. at 6.)

The second agreement is entitled "Telephone Audit Agreement" and covers 19 facilities. (Am. Compl., Ex. 5.) Also listed is a contact name for all facilities. The contact person, as in all three of the NUR - CCI contracts, is identified as Kimmi Rudolph, Hunter Management. (*Id*.) The set-up fee is waived under this contract, and NUR receives a 50% share of all the rebates/refunds for telephone operating expenses received as a result of its efforts. (*Id*.) NUR also receives a percentage share of all the savings in telephone operating expenses created by its efforts which in the first year was 50% and 40% in the second year. (*Id*.) NUR alleges that no refunds were identified pursuant to this contract, but that "certain cost-saving opportunities were found" and that money is due to it for these savings. (Am. Compl. at 9.)

The third agreement is entitled "Utility Audit Agreement" and covers 19 facilities. (Am. Compl., Ex. 6.) The agreement pertains to rebates and reductions in the "areas of Utilities, and Utility expenses." (*Id*.) The set-up fee is waived, and NUR receives a 50% share of all the rebates/refunds received as a result of its efforts. (*Id*.) NUR also receives a 50% and 40% share of all the savings it creates for the first and second years, respectively, of the contract. (*Id*.) NUR alleges that two refunds were obtained by it for CCI, and CCI paid NUR the agreed-upon compensation for those refunds. (Am. Compl. at 11-12.) NUR also alleges that it found the amount CCI was spending for its gas and water services was reasonable. (*Id*. at 12.) However, the amount CCI was paying for electricity was found by NUR to be excessive. (*Id*.) NUR President Leng advised Mr. Aronin of CCI of this, but Mr. Aronin allegedly told Mr. Leng that there could be no switch from the current supplier because the supplier was a "personal friend" of Mr. Rothner. (*Id*. at 13.) NUR further alleges that in January 2007, CCI "surreptitiously switched" to a new electrical supplier for some of the locations covered by this agreement. (*Id*.) NUR has not been able to obtain copies of relevant electrical bills and other data to determine the cost savings to CCI. (*Id*.) CCI also allegedly used the cost savings information provided by NUR for the benefit of other elderly care centers operated by CCI that were not included on the list attached to the agreement. (*Id*. at 14.)

NUR's claims for relief in this action are for: (1) accounting against Hunter and Defendant Rothner; (2) unfair and deceptive trade practice under North Carolina law against

Defendants Rothner and Aronin; (3) actual fraud against Defendants Rothner and Aronin; (4) constructive fraud against Defendants Rothner and Aronin; (5) quantum meruit and unjust enrichment against all Defendants; and (6) breach of contract against Hunter. (Am. Compl.)

On October 30, 2007, Plaintiff NUR filed a North Carolina state court action against CCI in the Superior Court of Guilford County. (Am. Compl. ¶ 5.) NUR asserted claims of breach of contract, accounting, and unfair or deceptive trade practices against CCI. (*Id.*, Ex. 1.) The state court denied CCI's motion to dismiss based on lack of personal jurisdiction, and that decision was upheld on appeal. (Am. Compl. ¶ 8.) On October 6, 2009, CCI filed a petition with the United States Bankruptcy Court for the Northern District of Illinois seeking Chapter 7 relief. (*Id.* ¶ 9.) NUR filed the present action in state court on December 31, 2009, and Defendants removed it to this Court on February 3, 2010. (*Id.* ¶ 12.)

The relationship between CCI and Hunter Management is disputed between the parties. It is not disputed that Defendants Aronin and Rothner, in addition to being officers of CCI, were managers of Hunter Management. (Docket No. 12, Declaration of Eric Rothner ("Rothner Decl.") ¶¶ 3, 5; Docket No. 13, Declaration of David Aronin ("Aronin Decl.") ¶¶ 4, 5.)[1] NUR President Leng in his affidavit states that Hunter "owned Care Centers and, until its bankruptcy, oversaw Care Centers." (Docket No. 21, Affidavit of Barry Christopher

---

[1] The declarations and affidavits are properly considered in connection with a Rule 12(b)(2) motion but are not considered with respect to the Rule 12(b)(6) motion.

Leng ("Leng Aff.") ¶ 3.) This allegation is based upon an email written by Kimmi Rudolph[2] to Mr. Leng in which she states that she "work[s] for Hunter Management which owns and oversees Care Centers." (*Id*., Ex. A at 26.) Ms. Rudolph is the "contact person" listed for all of the covered facilities on each of the three contracts at issue, and her name appears above the words, "Hunter Management." (Am. Compl., Exs. 4, 5, 6.) Ms. Rudolph is the person with whom Mr. Leng exchanged numerous emails in coordinating his work for CCI. (Leng Aff., Ex. A.)

On the other hand, Defendant Rothner states in his declaration that he and his wife own 100% of Hunter and he owned 99% of CCI until it declared bankruptcy. (Rothner Decl. ¶¶ 3, 5.) According to him, the offices of Hunter and CCI were in the same building, but they were "two separate companies with separate ownership structures." (*Id*. ¶ 8.) Defendant Rothner further states that CCI was a "financial management company providing services to nursing homes" (*id*. ¶ 6) while Hunter is "in the business of managing student apartments, coordinating the financing for the purchase of elder care facilities, and monitoring the accounts receivable financing for elder care facilities." (*Id*. ¶ 3.)

---

[2] In this email Ms. Rudolph states that her parents, apparently referring to the Rothners, "had hoped to do this without Care Centers realizing what was going on." She is apparently referring to entering into the contracts with NUR. (Docket No. 21, Ex. A at 26.)

# DISCUSSION

## A. Standard

In opposing a Rule 12(b)(2) motion for dismissal for lack of personal jurisdiction which is made on motion papers – including affidavits, legal memoranda, and the complaint – the plaintiff bears the burden of making a *prima facie* showing of personal jurisdiction. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). In determining whether a *prima facie* showing has been made, the court construes all relevant pleading allegations in the light most favorable to the plaintiff, assumes credibility, and draws the most favorable inferences in favor of jurisdiction. *Id*.

This Court must first consider whether the North Carolina long-arm statute, N.C. Gen. Stat. § 1-75.4, authorizes the exercise of jurisdiction over Defendants. *See Mylan Labs. Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993). The next inquiry is whether the exercise of personal jurisdiction comports with the requirements of the Due Process Clause. *See id*. The touchstone of this minimum contacts analysis is whether Defendants have engaged in some activity purposefully directed toward North Carolina. *See Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 945 (4th Cir. 1994).

A plaintiff fails to state a claim on which relief may be granted under Fed. R. Civ. P. 12(b)(6) when the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. __, __, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949.

Plaintiff must state with "particularity" all of the circumstances constituting fraud. Fed. R. Civ. P. 9(b); *Strum v. Exxon Co.*, 15 F.3d 327, 331 (4th Cir. 1994). Mere generalities and conclusory allegations of fraud will not suffice under North Carolina law. *Id*.

**B.      Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction**

On review of this argument of the parties, the Court finds that personal jurisdiction exists over Defendants Aronin and Rothner based upon their alleged actions on behalf of CCI. By and through the actions of the individual Defendants, CCI contracted with a North Carolina company for services that would be performed in North Carolina resulting in alleged injury to the North Carolina company. Plaintiff alleges that the individual Defendants participated in tortious actions that caused damage to Plaintiff. *See Columbia Briargate Co. v. First Nat'l Bank*, 713 F.2d 1052, 1064 (4th Cir. 1983) ("[W]hen a non-resident corporate agent is sued for a tort committed by him in his corporate capacity in the forum state . . ., he is properly subject to the jurisdiction of the forum court, *provided the long-arm statute of the forum state is co-extensive with the full reach of due process*.") (emphasis in original). *See also Blue Mako, Inc. v. Minidis*, 472 F. Supp. 2d 690, 701-02 (M.D.N.C. 2007) (if corporate officer actively participates in tort he may be liable even though acting in corporate capacity); *Foster-Boyd, Inc. v. QT Hosiery Sales Corp.*, No. C-86-

983-6, 1987 WL 20093, slip op. at 2 (M.D.N.C. Oct. 20, 1987) (personal jurisdiction may attach on basis of single out-of-state communication).

Defendant Hunter Management, under the allegations of the amended complaint and the showings of the parties, as outlined above, has sufficient minimum contacts with North Carolina to give rise to specific jurisdiction in this case. Defendant argues that Hunter played a significant role in the NUR - CCI contracts, and CCI acted "by and through" Hunter in the operation of the contracts. While there is considerable dispute concerning the nature of Hunter's involvement, it is undeniable that Hunter Management was effectively held out in the NUR - CCI contracts as the contact that was responsible for managing the contracts as they related to all of the CCI facilities identified in the contracts.[3] This, under the circumstances described n the factual summary above, constitutes a sufficient contact by Hunter to sustain specific jurisdiction over Hunter in this case.

C.      **Rule 12(b)(6) motion to dismiss for failure to state a claim**

   1.      **Breach of contract (sixth claim for relief)**

Finding that personal jurisdiction exists over Hunter, the Court will address the claims against it. NUR raises a claim of breach of contract against Hunter based on the second contract ("Telephone Audit Agreement") and the third contract ("Utility Audit Agreement").

---

[3] See the discussion immediately below in the text. The Court finds that Hunter Management was not a party to the NUR - CCI contracts, but, at the same time, it is apparent that Hunter was held out as the entity that had active management responsibilities with regard to the NUR - CCI contracts.

-8-

(Am. Compl. at 27-28.)  The obvious obstacle for NUR with respect to this claim is that these contracts on their faces show that the parties to the contracts are NUR and CCI.  (Am. Compl., Exs. 5, 6.)  NUR's "Client" is clearly identified in the opening paragraph of each contract as "Care Centers, Inc."  These contracts are signed by Defendant Aronin in his capacity as CFO of CCI.  (*Id*.)  There is no mention of Hunter Management in the body of the contracts.  (*Id*.)  In the listings of facilities covered by each of these two agreements, Ms. Rudolph's name appears as the "Contact for all facilities."  (*Id*.)  Her business address is listed as "Hunter Management" at its headquarters address in Illinois, along with her phone and fax numbers.  (*Id*.)

Defendant Hunter argues that this claim for relief should be dismissed simply because it is not a party to these two contracts.  (Docket No. 31 at 18-19.)  *See Keith v. Day*, 81 N.C. App. 185, 200, 343 S.E.2d 562, 571 (1986) (corporate defendant should have been dismissed because contract was between only plaintiff and individual defendant).  Plaintiff NUR responds in its briefing to the Court by stating only that it has "asserted a legally sufficient claim on this theory."  (Docket No. 35 at 19.)  NUR concedes also that it is not asserting an *alter ego* claim against any Defendant.  (*Id*.)  Plaintiff argued at oral argument that the inclusion of Ms. Rudolph's address at "Hunter Management" on the listings has the effect of extending the contracts to cover the Hunter Management headquarters building for audit purposes.  The Court rejects this argument.  "Hunter Management" is not listed as a separate client facility covered by the agreements.  It appears only in connection with portraying the

affiliation of Ms. Rudolph who is listed as the contact person for all facilities. Accordingly this Court concludes as a matter of contract construction that Hunter Management was not a covered entity or facility under either the second or third contracts. The contracts unambiguously show that Hunter Management was not a party to these contracts between CCI and Plaintiff.

NUR has failed to provide any authority for its position that it may hold Hunter liable for breach of these two contracts. Because NUR has failed to plead facts that allow this Court to draw a reasonable inference that Hunter is liable for breach of contract, this claim for relief should be dismissed pursuant to Rule 12(b)(6). *See Iqbal*, 129 S. Ct. at 1949.

### 2. Quantum meruit and unjust enrichment (fifth claim for relief)

NUR raises a claim for quantum meruit and unjust enrichment against all Defendants. (Am. Compl. at 75-80.) It claims that it conferred a benefit upon all three Defendants "as direct or indirect owners of" CCI, and upon Hunter "on account of its having implemented directly Plaintiff's proposed cost-savings measures." (*Id*.) NUR seeks to recover the reasonable value of the benefits conferred upon Defendants. (*Id*.)

Defendants argue that this claim must be dismissed because a quantum meruit claim is viable only in the absence of an express contract. *See* Docket No. 31 at 19; *Keith*, 343 S.E.2d at 570 (valid express contract precluded recovery in quantum meruit based on the same subject matter between parties). NUR does not respond directly to this argument, and

does not assert that the contracts are invalid. It simply states that it "has asserted legally sufficient claims on these theories." (Docket No. 35 at 19.)

As shown by the language quoted above from NUR's Amended Complaint, it seeks to recover in quantum meruit based upon the benefits which supposedly accrued to Defendants based upon the express contracts it had with CCI. The *Keith* case shows that a quantum meruit claim against CCI is foreclosed based on those valid contracts. The individual Defendants and Hunter are not parties to those contracts, however. Nevertheless, because the benefit allegedly conferred by NUR upon the individual Defendants arises from the express contracts, and is not in any way independent of those contracts, recovery in quantum meruit against Defendants Rothner and Aronin as non-parties to the contracts are still precluded. *See Hurst v. Dezer/Reyes Corp.*, 82 F.3d 232, 237-38 (8th Cir. 1996) ("The key to any quantum meruit recovery from a non-contracting party . . . is proof that he unjustly received and retained an independent benefit from the plaintiff's contractual services."). With regard to Hunter Management, Plaintiff contends that it discovered cost-savings with respect to Hunter facilities. (Docket No. 35 at 11 n.4.) Plaintiff's Amended Complaint states that the "cost-savings uncovered by Plaintiff were intended only for the benefit of the Care Centers locations and the single Hunter Management location identified on the list" of locations and addresses of the Exhibit 6 agreement (the third contract), and for no other Care

Centers or Hunter Management locations.[4] (Am. Compl. ¶ 38.) Plaintiff alleges that Hunter Management was enriched by using the cost-savings data provided by Plaintiff for the benefit of "other facilities" of Hunter Management. (*Id*.) These allegations are sufficient to state a legal claim against Hunter Management in quantum meruit and unjust enrichment.

NUR's claim for quantum meruit and unjust enrichment should be dismissed as to the individual Defendants, but should proceed as to Defendant Hunter Management.

3. **Constructive fraud (fourth claim for relief)**

NUR raises a claim of constructive fraud against Defendants Rothner and Aronin. (Am. Compl. at 25-26.) NUR alleges that Defendants failed to advise it of any deterioration in the financial condition of CCI during the time that NUR was entitled to compensation and made preferential payments to creditors other than NUR at a time when CCI was insolvent or on the verge of insolvency, thereby breaching the fiduciary duty owed by Defendants to NUR and causing such conduct by Defendants to be constructively fraudulent as to NUR. (*Id*.)

A constructive fraud claim based upon a fiduciary duty running from corporate officers to creditors arises only "under circumstances amounting to a 'winding-up' or dissolution of the corporation." *Whitley v. Carolina Clinic, Inc.*, 118 N.C. App. 523, 528,

---

[4] As noted earlier in the text, Plaintiff's allegation that the Hunter Management headquarters was a covered facility is conclusively contradicted by the contracts at issue. Hunter Management is identified in the listings attached to the contracts only as identification of Kimmi Rudolph, the "Contact for all facilities."

455 S.E.2d 896, 900 (1995); *see In re Bostic Constr., Inc.*, 435 B.R. 46, 62 (Bankr. M.D.N.C. 2010) (exception to general rule that directors of N.C. corporations do not owe fiduciary duty to creditors of corporation exists when there are circumstances amounting to a winding up or dissolution of the corporation). Balance sheet insolvency absent those circumstances "is insufficient to give rise to breach of a fiduciary duty to creditors of a corporation." *Whitley*, 455 S.E.2d at 900; *see Angell v. Kelly*, 336 F. Supp. 2d 540, 550-51 (M.D.N.C. 2004).

Defendants argue that NUR has failed to comply with the *Iqbal* requirement of pleading factual content that allows the court to draw the reasonable inference that Defendants are liable. (Docket No. 31 at 18; *see Iqbal*, 129 S.Ct. at 1949.) In response, NUR states only that its claim for constructive fraud "is based on several factual premises that would have to be developed during discovery." (Docket No. 35 at 19.) NUR has wholly failed to plead facts that show plausible support for this claim. It asks the Court to allow discovery on the matter in hopes of finding some evidence showing that CCI's financial circumstances were deteriorating during the relevant time period to the extent required to create a fiduciary relationship. (*Id.*) Such a procedure is contrary to *Iqbal*. Accordingly, this Court should reject NUR's request to allow this claim to proceed into discovery and dismiss its constructive fraud claim pursuant to Rule 12(b)(6).

### 4. Actual fraud (third claim for relief)

Plaintiff NUR alleges that Defendants Rothner and Aronin committed actual fraud by way of three fraudulent concealments. (Am. Compl. at 24-25.) The first fraudulent concealment is alleged to be that, before any contract documents were signed, Defendants formed an intent never to allow CCI or Hunter to pay Plaintiff NUR any amount whatsoever for telephone or electricity cost-savings found by NUR. (*Id*. at 16.) The second fraudulent concealment is alleged to be that on June 1, 2006, two days after CCI entered into agreements with NUR, CCI secretly entered into an agreement with Prospect Resources, Inc.,. to perform essentially the same cost analysis that NUR had been engaged to perform. (*Id*. at 17.) The third fraudulent concealment is alleged to be that Defendants contracted with a new electricity vendor around January 2007 and concealed this contract from NUR. (*Id*. at 18.)

Defendants argue that each of these alleged fraudulent concealments is merely a restated claim for breach of the express contracts between CCI and NUR. (Docket No. 31 at 13.) They contend that the attempt to turn such a contract dispute into a tort action with a punitive dimension is inconsistent with North Carolina law and sound commercial practice, according to Defendants. (*Id*. (citing *Strum*, 15 F.3d at 329).)

Plaintiff NUR does not dispute that to properly state its fraud claim it must allege something more than that Defendants intentionally breached a promise. (Docket No. 35 at 13.) It relies upon cases holding that in North Carolina an "intentional breach of a promise can support a claim for fraud where the promissor had a specific intent not to keep his

-14-

promise when he made it." *Mid-Atlantic Blended Prods., Inc. v. Monotech Int'l, Inc.*, No. 105CV00571, 2006 WL 2014714, slip op. at 6 (M.D.N.C. May 9, 2006); *see Norman v. Tradewinds Airlines, Inc.*, 286 F. Supp. 2d 575, 594 (M.D.N.C. 2003).

Plaintiff NUR fails to follow through with this argument and point to any facts it has alleged which support its contention that Defendants had formed a specific intent not to keep their promises when they entered into the contracts with NUR. (Docket No. 35 at 13-14.) The alleged fraudulent concealments do not show that Defendants formed such an intent. The first alleged concealment is simply that such an intent was formed at the time of contracting without any supporting facts. This alleged concealment neither states a claim of individual fraud nor shows a specific intent not to honor the contracts when they were made.

The second alleged concealment is that two days *after* contracting with NUR, CCI entered into a contract with another company to perform the same cost analysis. Nothing is alleged regarding whether Defendants paid that company for its services. The contract with the other company, Prospect, was signed by CCI C.O.O. Mark Steinberg rather than Defendant Aronin who signed the contract with NUR. (Docket No. 21, Ex. C.) NUR does not allege that Defendant Aronin knew of this contract. Plaintiff does not cite any exclusivity arrangement in its contracts with CCI which the Prospect contract violated. Although many facilities listed on the Prospect contract are the same as those listed in the NUR contract, the facilities listed are not identical. (*Id*.) This alleged concealment therefore fails to show an intent formed by Defendants Rothner and Aronin at the time of contracting not to pay.

-15-

The third alleged concealment, CCI's alleged switch to a different electrical vendor, allegedly occurred in January 2007, well after CCI contracted with NUR in May 2006. Thus, this alleged change in its provider of electrical services fails to plausibly suggest any intent of Defendants at the time of contracting with NUR. Plaintiff also could not have been misled by this occurrence, or relied upon it, since it occurred well after the contract was formed.

Because NUR has failed to allege facts supporting its theory that Defendants formed an intent not to pay at or prior to the time of contracting, NUR's claim for fraud should be dismissed.[5] *See Norman*, 286 F. Supp. 2d at 594; *Mid-Atlantic Blended Prods. Inc.*, 2006 WL 2014714.

Plaintiff's fraud claim suffers from another defect, independent of the failure to allege sufficient facts of an intent not to perform. Plaintiff concedes that because there is no fiduciary duty in a vendor-vendee relationship, in order to state a valid fraud claim based on concealments it must allege that Defendants had a duty to speak about the alleged concealments. (Docket No. 35 at 15.) Such a duty to speak, Plaintiff further argues, arises

---

[5] Plaintiff concedes that Defendants made two payments to Plaintiff based upon refunds realized through Plaintiff's work pursuant to the contracts at issue. (Am. Compl. ¶ 33.) Such performance under the contracts reduces the likelihood and suggests that it is implausible that Defendants formed an intent at the time the contracts were signed not to pay Plaintiff. Plaintiff cites a statement allegedly made by Defendant Rothner that he had "nothing to lose" by signing the contracts, and argues this is evidence of promissory fraud. However, this statement gives rise to no such fair inference. Under the contracts, CCI owed nothing to Plaintiff unless Plaintiff saved CCI money, and the only a portion of the savings were due to Plaintiff. Under these circumstances, CCI truly had nothing to lose under the contracts.

in this action because Defendants took "affirmative steps" to conceal "material facts" from NUR. (*Id.* at 15-16.) *See Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 196 (M.D.N.C. 1997).

A fact is "material" if the "fact untruly asserted or wrongfully suppressed, if it had been known to the party, would have influenced his judgment or decision in making the contract at all." *White Sewing Mach. Co. v. Bullock*, 161 N.C. 1, 7, 76 S.E. 634, 636 (1912). *See Bear Hollow, L.L.C. v. Moberk, L.L.C.*, No. 5:05CV210, 2006 WL 1642126, slip op. at 6 (W.D.N.C. June 5, 2006); *Godfrey v. Res-Care, Inc.*, 165 N.C. App. 68, 75-76, 598 S.E.2d 396, 402 (2004). A concealment which occurs after the formation of the contract cannot, therefore, be "material" to the contract because it could not have influenced the decision to make the contract. *See Lowe's Cos., Inc. v. Pacific Research Grp., Inc.*, No. 5:05-cv-524, 2007 WL 1040481, slip op. at 2 (W.D.N.C. Mar. 29, 2007).

A review of the asserted "affirmative steps" alleged by NUR fails to show that any qualify as a concealment of "material" facts. NUR identifies as an "affirmative step" certain alleged assurances made by Defendant Rothner to NUR President Leng during a phone call on January 9, 2007. (Docket No. 35 at 15 (describing affirmative steps); Am. Compl. ¶ 47 (allegation of the phone call and assurances made).) The contracts at issue were made in May 2006, well before this phone conversation. Therefore, these assurances could not have influenced NUR's decision to enter into the contracts. Plaintiff's fraud claim should be dismissed for this reason as well.

### 5. Unfair or deceptive trade practice (second claim for relief)

Plaintiff claims that the actions of Defendants Rothner and Aronin surrounding the three alleged fraudulent concealments constitute an unfair or deceptive trade practice in violation of North Carolina law. (Am. Compl. at 15-24.) Defendants argue that Plaintiff cannot make out a claim for unfair or deceptive trade practice based on this contract dispute. (Docket No. 31 at 17.) *See Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 347 (4th Cir. 1998).

Plaintiff NUR does not directly address the *Broussard* line of cases in which the Fourth Circuit cautions that a claim for unfair and deceptive trade practices which is centered in a contract dispute should not be allowed to proceed absent "substantial aggravating circumstances." *Id*. at 347; Docket No. 35 at 17. It is clear from the facts and procedural history of this action, including Plaintiff's initial attempt to sue CCI for breach of contract which was stymied by CCI's bankruptcy, that this is a dispute centered on the contracts between NUR and CCI. As seen from the above discussions, Plaintiff has failed to make out its fraud claims. Therefore, this Court finds no "substantial aggravating circumstances" to support a claim of unfair or deceptive trade practices. This claim should be dismissed pursuant to Rule 12(b)(6). *See Broussard*, 155 F.3d at 347.

### 6. <u>Accounting (first claim for relief)</u>

Plaintiff concedes that this claim for relief is ancillary to its other claims. (Docket No. 35 at 18.) Because most of Plaintiff's claims should be dismissed, as described above, its claim for an accounting should also be dismissed pursuant to Rule 12(b)(6) with regard to all claims except for Plaintiff's claim against Hunter Management based upon quantum meruit and unjust enrichment.

### CONCLUSION

For the foregoing reasons, **IT IS RECOMMENDED** that Defendants' Motion to Dismiss Amended Complaint (Docket No. 30) be granted in part and denied in part, as set out above.[6] The sole claim that should proceed is Plaintiff's claim against Hunter Management based upon quantum meruit and unjust enrichment.

                                                        /s/ P. Trevor Sharp
                                            United States Magistrate Judge

Date: June 27, 2011

---

[6] Defendants' initial motion to dismiss, Docket No. 10, is dismissed as moot in view of Plaintiff's subsequent Amended Complaint.